OTTO LAW, LLC
Mike Otto 07272)
4001 South 700 East
Murray, UT 84107
(435) 640-7221
motto63@gmail.com

*Attorney for Plaintiffs*

---

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH**

---

| | |
|---|---|
| DOUGLAS AVERY LAMONT, an Individual, CHERYL LAMONT STEVENS, an individual, | : **VERIFIED COMPLAINT** :<br>: :<br>: : |
| Plaintiffs, | : Case No. _____ :<br>: |
| WASATCH COMMONS HEBER, LLC, a California limited liability company, APARTMENT MANAGEMENT CONSULANTS, LLC, a Utah limited liability company, HEIDI WOOLSEY, an individual, SHANTEL STEINMILLER, an individual, JACKSON SARGENT, an individual, BREE SARGENT, an individual, and Doe Defendants I – X, | : Judge _____ :<br>: :<br>: :<br>: :<br>: :<br>: :<br>: Tier III :<br>: |
| Defendants. | : :<br>: |

Plaintiffs Douglas Lamont and Cheryl Lamont Stevens (collectively "Plaintiffs" herein),

through their counsel, Mike Otto, and being under penalty of perjury pursuant to *Utah Code Ann.*

*§ 78B-18a-101 et. seq.*, make this Verified Complaint against the defendants named or described

herein and asserting the following under oath.

## PARTIES, JURISDICTION AND VENUE

1.      Douglas Avery Lamont ("Plaintiff Lamont") is an individual residing in Wasatch County, Utah and the husband of Plaintiff Cheryl Lamont Stevens.

2.      Cheryl Lamont Stevens ("Plaintiff Lamont Stevens") is an individual residing in Wasatch County, Utah and the wife of Plaintiff Douglas Avery Lamont.

3.      Defendant Wasatch Commons Heber, LLC ("Wasatch Commons") is a California limited liability company with its principal place of business in Utah is the Wasatch Commons Apartments at 2790 N. Common Boulevard, Heber City, Utah 84032 and whose business includes engaging in residential real estate-related transactions.

4.      Defendant Apartment Management Consultants, LLC ("AMC") is a Utah limited liability company with its principal place of business in Salt Lake County, Utah and whose business includes engaging in residential real estate-related transactions.

5.      Defendant Heidi Woolsey ("Woolsey") is an individual residing in Utah and a person whose business includes engaging in residential real estate-related transactions.

6.      Defendant Shantel Steinmiller ("Steinmiller") is an individual residing in Utah and a person whose business includes engaging in residential real estate-related transactions.

7.      Defendant Jackson Sargent is an individual who on Plaintiffs' information and belief currently resides in Summit County but lived in Wasatch County when the acts and omissions alleged in this Verified Complaint occurred.

8.      Defendant Bree Sargent is an individual who on Plaintiffs' information and belief currently resides in Summit County but lived in Wasatch County when the acts and omissions alleged in this Verified Complaint occurred.

9.      The Doe Defendants are individuals and/or entities whose names and domiciles Plaintiffs currently do not know but who assisted the named defendants in violating Plaintiffs' rights as described herein.  Plaintiffs will amend this Verified Complaint to name those Doe Defendants and ascribe to them acts and omissions that violated Plaintiffs' legal rights as that information is learned through discovery.

10.      The U. S. District Court for the District of Utah has original jurisdiction over this action pursuant to *28 U.S.C. § 1332*, as Plaintiffs' claims herein under the Federal Fair Housing Act (*42 U.S.C. § 3604*) arise under the laws of the United States.

11.      Venue before this court is proper under *28 U.S.C. § 1391(1 – 3).*

## GENERAL ALLEGATIONS

12.      Plaintiff Lamont is a "Person" under *42 U.S.C. § 3602(d)* and a "Family" under *42 U.S.C. 3602(c).*

13.      Plaintiff Lamont Stevens is also a "Person" under *42 U.S.C. § 3602(d)* and a "Family" under *42 U.S.C. 3602(c).*

14.      Plaintiffs collectively are also a "Family" under *42 U.S.C. 3602(c).*

15.      Plaintiff Lamont was in a motorcycle accident in the late 1970s and has suffered from muscle and skeletal problems since.  He has had multiple surgeries and medical procedures over the past forty years, has difficulty walking and lives with chronic pain.  He and his conditions have been monitored and treated by several medical health professionals during the past forty years.  He also has a panic disorder for which he has received and continues to receive treatment from medical health professionals.  In February 2020, he contracted what has become a chronic bacterial lung infection.  He needs rest to keep his immune system functioning as best it can.

16.     The United States Social Security Administration deemed Plaintiff Lamont a disabled person in approximately September 2010.  Plaintiff Lamont has since been retired due to permanent disability and receiving Social Security Disability benefits.

17.     Plaintiff Lamont i) is a person with physical impairments which substantially limit one or more of his major life activities, ii) has a record of having such an impairment; iii) is regarded as having such an impairment; and iv) is therefore a person with a "Handicap" under *42 U.S.C. § 3602(h)(1)* of the Federal Fair Housing Act (the "Federal Act") and a person with a "Disability" under *§ 57-21-2(10)(a)* of the Utah Fair Housing Act (the "Utah Act").

18.     Plaintiff Lamont Stevens has had chronic Lyme since 1977.  She has a co-infection with chronic Epstein Barr that is exacerbated by fatigue. She is diagnosed with fibromyalgia, chronic adrenal fatigue and chronic general fatigue.  She has chronic pain, which increased significantly in 2021 due to a femoral nerve hip impingement (FAI femoroacetabular impingement).  The United States Social Security Administration deemed Plaintiff Lamont a permanently disabled person before the events described in this Verified Complaint.  One component of her permanent disability is due to a cognitive disorder with multiple etiologies.

19.     On December 7, 2016, United States Social Security Administration deemed Plaintiff Lamont Stevens a disabled person since September 4, 2012 .  Plaintiff Lamont Stevens has been retired due to permanent disability and receiving Social Security Disability benefits since September 4, 2012.

20.     Plaintiff Lamont Stevens i) is a person with physical impairments which substantially limit one or more of her major life activities, ii) has a record of having such an impairment; iii) is regarded as having such an impairment; and iv) is therefore a person with a

"Handicap" under *42 U.S.C. § 3602(h)(1)* of the Federal Act and a person with a "Disability" under *§ 57-21-2(10)(a)* of the Utah Act.

21.     Wasatch Commons is comprised of "building[s], structure[s], [and] portion thereof which [are] occupied as, or designed or intended for occupancy as, a residence by one or more families" and is therefore a "Dwelling" under *42 U.S.C. § 3602(B)* of the Federal Act and *§ 57-21-2(14)(a)* of the Utah Act.

22.     AMC is Wasatch Common's property manager.

23.     Steinmiller is an employee and agent of AMC.

24.     Woolsey is also an employee and agent of AMC.

25.     Steinmiller on information and belief is also a member and principal of AMC.

26.     Woolsey on information and belief is also a member and principal of AMC.

27.     Steinmiller, Wasatch Commons, AMC and Woolsey "within the preceding twelve months, participated as principal(s) in three or more transactions involving the sale or rental of a dwelling" under *42 U.S.C. § 3603(c)(1)*.

28.     Steinmiller, Wasatch Commons, AMC and Woolsey within the twelve months preceding their acts and omissions described herein also participated as principal(s) in three or more transactions involving the sale or rental of a dwelling.

29.     Steinmiller, Wasatch Commons, AMC and Woolsey have "within the preceding twelve months participated as principal in three or more transactions involving the sale or rental of any dwelling" under *42 U.S.C. § 3603(c)(2)*.

30.     Steinmiller, Wasatch Commons, AMC and Woolsey is/are the owner(s) of Wasatch Commons, a dwelling occupied by five or more "Families" or owned it when the acts and omissions described herein were committed.

31.     Steinmiller, Wasatch Commons, AMC and Woolsey are each "persons deemed to be in the business of selling or renting dwellings" under *42 U.S.C. § 3603(c)(1 - 3)*.

32.     Plaintiffs on or about June 10, 2020 made as "Resident" a written Utah Residential Rental Agreement and its Addenda with Wasatch Commons as "Owner" (the "Agreement").

33.     Steinmiller signed the Agreement and each Addendum thereto as "Owner or Owner's Representative."

34.     Steinmiller signed the Agreement and its Addenda as "Owner or Owner's Representative" in her individual capacity and not as the designated representative of any entity.

35.     Steinmiller in the alternative signed the Agreement and its Addenda as the designated representative of Wasatch Commons as "Owner" and/or AMC as "Owner as Owner's Representative."

36.     Plaintiffs each signed the Agreement individually.

37.     The Agreement's designated term was from June 15, 2020 until June 30, 2021.

38.     The Agreement memorialized that during its term Plaintiffs would rent from Steinmiller and/or Wasatch Commons and/or AMC Unit B-207 of Wasatch Commons ("Unit B-207" hereinafter).

39.     The Agreement memorialized Plaintiffs' Agreement to pay Wasatch Commons and Wasatch Commons' agreement to accept from Plaintiffs the following base sums as consideration for renting Unit B-207 to Plaintiffs during the Agreement's term: a) rent of $1,386.00 per month; b) a cable/media fee of $100.00 per month; (c) a garage fee of $110 per month; and d) a parking fee of $20.00 per month.

40.     The Agreement further memorialized that Plaintiffs paid Wasatch Commons and Wasatch Commons accepted from Plaintiffs the following other non-refundable fees as

consideration for renting Unit B-207 to Plaintiffs: a) a "lease initiation" fee of $299.00; b) prorated rent for June 15, 2020 through June 30, 2020 of $739.00; and c) an "inspection fee" of $25.00.

41.     Plaintiffs paid AMC $2,461.00 when they took possession of Unit B-207.

42.     Plaintiffs throughout the term of the Agreement timely paid to AMC approximately $1,683.00 each month to rent Plaintiff's Unit.

43.     Plaintiffs paid AMC approximately $15,000 for rent and other fees set forth in the Agreement while they occupied Unit B-207.

44.     A fully executed "Community Policies and Procedures Addendum to the Lease Agreement" was one of the Addenda to the Agreement.

45.     Section 12 of the "Community Policies and Procedures Addendum to the Lease Agreement" was titled "Disturbances, Noises, etc." and stated (emphases and underscoring in original):

> Residents must refrain from making or permitting **any** disturbing noises by their family members or guests.  Quiet hours are considered **<u>between 10:00 pm to 8:00 am</u>**.  Any noisy or boisterous conduct, including the loud playing of stereos, televisions or musical instruments, which would disturb the peace and quiet enjoyment of other Residents, is absolutely prohibited.  The practice of any illegal activities is grounds for eviction.

46.     Section 26 of the "Community Policies and Procedures Addendum to the Lease Agreement" was titled "Pets" and stated (emphases supplied):

> This community **may or may not** allow pets.  If pets are permitted, permission must be secured in writing from Management with the appropriate deposits or fees paid.in full before the pet may reside in your apartment.  Visiting animals are **not** permitted at any time.  Please make sure your guests are aware of this policy so they may make other arrangements.  Pet owners must clean up after their pets and adhere to all other guidelines involved in the Pet Addendum.
>
> Assistance Animals are not considered pets but require prior written approval that is verified.  Once approved, Resident will be allowed the appropriate Assistance Animal.  Guest Assistance Animals must have prior written approval which may or may not be granted.

47.     A fully executed "Animal (Pet) Agreement" was one of the Addenda to the Agreement.

48.     Subsection (c)(1) of the "Animal (Pet) Agreement" was titled "Nuisance" and stated in part:

> The Animal may not cause any damage to the premises.  Nor may the Animal cause any discomfort, annoyance, or nuisance to any other resident or to Owner. Determination of what is a nuisance shall be at the sole discretion and opinion of Owner.

49.     Subsection (c)(5) of the "Animal (Pet) Agreement" was titled "Compliance with Laws" and stated in part: "Residents agree to comply with all applicable governmental laws and regulations."

50.     Section (d) of the "Animal (Pet) Agreement" was titled "Owner's remedies for violations" and its subsection 1 ("Removal of Animal by Residents") stated: "If, in Owner's sole judgment, any rule or provision of this Animal Agreement is violated by Residents or their guests, Resident shall immediately and permanently remove the Animal from the premises upon written notice from Owner."

51.     Subsection (d)(4) of the "Animal (Pet) Agreement" was titled "Injuries" and stated in part: "Residents shall be strictly liable for the entire amount of any injury to any person or property caused by the Animal[] and shall indemnify Owner for all costs of litigation and attorney's fees resulting from same."

52.     The Agreement memorialized Steinmiller and/or Wasatch Commons and/or AMC "granting for a consideration the right to occupy premises not owned by [Plaintiffs]" and therefore "to rent" Unit B-207 under *42 U.S.C. 3602(c)* of the Act.

8

53.     Plaintiffs sold their home in the Uinta Mountains because it was too much for Plaintiffs to manage physically.  Plaintiffs planned to rent housing for two years while they worked on improving their health and decided where would be best for them to settle.

54.     Plaintiffs chose Unit B-207 in significant part because it is a ground-floor unit with no steps and the "Community Policies and Procedures Addendum to the Lease Agreement" memorializing that "any noisy and boisterous conduct" during the "Quiet hours [] considered between 10:00 pm to 8:00 am" (hereinafter the "Quiet Hours") was "absolutely prohibited.":

55.     Plaintiffs took possession of Unit B-207 on or about June 15, 2020.

56.     Jackson Sargent and Bree Sargent were the occupants and lessors of Wasatch Commons Unit B-307 (the "Sargent Unit") directly above Unit B-207 on July 1, 2020.

57.     Jackson Sargent and Bree Sargent kept two dogs in the Sargents' Unit.   One of the dogs weighed approximately 100 pounds and the other approximately 50 – 60 pounds.

58.     The dogs in the Sargents' Unit were not assistance or service animals.

59.     Shortly after July 1, 2020, loud noises emanated from the Sargent Unit most every night and morning during Quiet Hours.  The two dogs being kept in the Sargent Unit barked, howled and whined in the Sargent Unit directly above Plaintiffs most every night and morning during Quiet Hours.

60.     Also shortly after July 1, 2020, Plaintiffs noticed that on most of these nights more percussive "thudding" noises punctuated the Sargents' noisy and boisterous conduct.

61.     Not long after July 1, 2020, Plaintiffs realized that the Sargents' noisy and boisterous conduct during some nights and mornings was confined to one isolated or short disturbance.  During some nights and mornings the noisy and boisterous behavior manifested through more than one or multiple isolated or short disturbances.  During other nights and

mornings it sustained for one period of ten minutes or more.  During some nights and mornings it sustained for more than one period of thirty minutes.  During some nights and mornings the noise and related disturbance sustained for hours on end.

62.     Not long after July 1, 2020, Plaintiffs realized that the Sargents' pattern of noisy and boisterous conduct was depriving them of a restful and recuperative sleep most nights.  The Sargents' sporadic and sustained boisterous and noisy conduct during Quiet Hours most every night and morning was hurting Plaintiffs physically, mentally and emotionally.

63.     Plaintiff Lamont discussed the Sargents' pattern of noisy and boisterous conduct most every night and morning with Jackson Sargent in August or September of 2020.

64.     Plaintiffs also discussed the Sargents' pattern of noisy and boisterous conduct most every night and morning with Bree Sargent several times in the fall of 2020.

65.     Plaintiffs informed the Sargents that their pattern of noisy and boisterous conduct most every night and morning was depriving Plaintiffs of their recuperative and restful sleep.

66.     The Sargents' noisy and boisterous conduct was objectively disruptive, obnoxious and hostile to the quiet and peaceful enjoyment of the occupants of Unit B-207 directly beneath the Sargents' Unit.

67.      Plaintiff Lamont Stevens between September 2020 and January 2021 spoke at least twice about the Sargents' noisy and boisterous conduct with a woman whose first name was "Shantelle" or "Shantell" and was an authorized agent of Wasatch Commons and/or AMC in managing Wasatch Commons.

68.     On or about December 26, 2020, Plaintiffs met with Woolsey at Wasatch Commons' offices to discuss the seriousness of the boisterous and noisy conduct and ask Wasatch

Commons her to intervene with the residents in C-207.  Woolsey said she took the problem seriously and would contact the residents in C-207.

69.    After Plaintiffs discussed the Sargents' pattern of noisy and boisterous conduct most every night and morning with Woolsey on or about December 26, 2020, the Sargents only accelerated their pattern of noisy and boisterous conduct most every night and morning.  The disturbances became even more gratuitous, frequent and even more loud and disturbing than they had before.  The Sargents' accelerated pattern of noisy and boisterous conduct during Quiet Hours most every night and morning compounded the negative physical, mental and emotional effects on Plaintiffs that the Sargents' noisy and boisterous conduct was visiting on them..

70.    Plaintiffs documented the Sargents' boisterous and noisy conduct and met again with Woolsey on January 5, 2021.   Plaintiffs emailed Woolsey documentation of the Sargents' boisterous and noisy conduct before their January 5, 2021 meeting and provided Woolsey another copy of it when they met on January 5, 2021.

71.    The first thing Woolsey said to Plaintiffs during their January 5, 2021 meeting was that Plaintiffs needed to call the Wasatch County Sheriff.  Woolsey also told Plaintiffs that needed to have a staff member of Wasatch Commons and/or AMC come to Unit B-207 to "verify" the Sargents' prohibited noisy and boisterous conduct when they engaged in it.

72.    Office hours at Wasatch Commons for its administrative staff and authorized agents were between 8:00 a.m. and 6:00 p.m.  No authorized agent of Wasatch Commons or AMC was on-site between 6:00 p.m. and 8:00 a.m.

73.    Plaintiffs could not have an authorized agent of Wasatch Commons or AMC come to Unit B-207 to "verify" the Sargents' prohibited noisy and boisterous conduct during Quiet Hours because no authorized agent of Wasatch Commons or AMC was on site during those hours.

11

74.     On January 10, 2021, Plaintiff Lamont suffered a nervous breakdown that required Plaintiff Lamont Stevens to transport him to the emergency room at Intermountain Healthcare in Heber City, Utah on 01/10/2021. During the emergency room visit Plaintiff Lamont spoke to a crisis counselor about the aggravation and stress he was experiencing at the apartment. She was concerned for his mental health.  Plaintiffs provided written documentation of the Sargents' pattern of noisy and boisterous conduct during Quiet Hours to the other Defendants hereto and/or their authorized agents on, without limitation, December 21, 2020, December 26, 2020, January 4, 2021 and February 3, 2021.  Plaintiffs' documentation included audio recordings with the dates and times at which they were made of the Sargents' noisy and boisterous behavior.

75.     The Sargents' pattern of gratuitous noisy and boisterous conduct caused so much daily stress and daily physical distress to Plaintiffs that it soon consumed their lives.  It created another  pattern of Plaintiffs being rousted from their sleep, falling back asleep and being rousted from that sleep again felt like a form of torture to Plaintiffs, as did the daily impending dread of the coming night and the Sargents' observance of their own pattern of noisy and boisterous conduct during Quiet Hours most every night and morning.

76.     Months of sleep deprivation, exhaustion, lack of resolution and the compounding angst associated therewith resulted in Plaintiffs' general inability to cope with the activities of daily living, particularly given Plaintiffs' documented disabilities.

77.     The COVID-19 pandemic was at its height in the United States and Utah when Plaintiffs rented Unit B-207.  No vaccine had yet been approved or announced.

78.     COVID-19 presented higher risks to Plaintiffs than it did even to the general population.  Two doctors advised Plaintiff Lamont that contracting COVID-19 would likely be fatal to him.

12

79.    The COVID-19 pandemic and its safety protocols created in Plaintiffs the heightened expectation that their privacy and their home would be respected, not flouted.

80.    The COVID-19 pandemic and the anxiety it created for Plaintiffs was compounded by the anxiety created by the Sargents' pattern of noisy and boisterous conduct and vice versa.

81.    Plaintiffs repeatedly requested that an authorized agent of Wasatch Commons or AMC come to Unit B-207 between 5:00 p.m. and 6:00 p.m. to "verify" the types of disturbing noises that the Sargents also made during Quiet Hours most every night and morning.  Wasatch Commons and AMC declined this request through Woolsey

82.    Plaintiffs asked Woolsey if they should hire a private investigator to "verify" for her satisfaction the Sargents' noisy and boisterous conduct during Quiet Hours most every night and morning.  Woolsey said that was unacceptable.

83.    On January 8, 2021, Plaintiffs through an e-mail addressed to "Shantelle" at "wasatchcommions@amcllc.net and Woolsey at "wacmgr@amcllc.net" advised that they were considering retaining legal counsel to compel enforcement of the Agreement, vacate Unit B-207 and bill Wasatch Commons and/or AMC for their hotel rooms and moving expenses.

84.    On January 11, 2021, Woolsey called Plaintiffs and informed that she had conferred with corporate counsel of AMC and/or Wasatch Commons about Plaintiffs.  She told Plaintiffs that corporate counsel told Woolsey to tell Plaintiffs that the Sargents' noisy and boisterous conduct during Quiet Hours most every night and morning was allowed because i) the Sargents' schedules were different from Plaintiffs' schedules; and ii) if the Sargents' dogs were children they would also be allowed to "play." Woolsey also repeated her demand to Plaintiffs that a third party "verify" the Sargents' noisy and boisterous conduct during Quiet Hours most every night.

85.     Neither the "Community Policies and Procedures Addendum to the Lease Agreement" nor the "Animal (Pet) Agreement" mention children, let alone distinguish them even from pets, let alone other animals.

86.     Plaintiffs never called the Wasatch County Sheriff because they know it is not the Sheriff's job to i) enforce the rules and regulations of a private apartment complex that are not Wasatch County's rules and regulations; or ii) to serve as "on-call" witnesses to "verify" the Sargents' noisy and boisterous conduct that Plaintiffs had already documented.

87.     Also by February 2021, Plaintiff Lamont Stevens was experiencing symptoms of POTS (Postural orthostatic tachycardia syndrome) accompanied by fainting and falling.  Her doctor referred Plaintiff Lamont Stevens to a cardiologist, who diagnosed her with hyperadrenergic postural orthostatic tachycardia syndrome (POT) characterized by syncopal episodes, palpitations, and inappropriate sinus tachycardia, and exacerbated by multiple stressors, chronic adrenal fatigue, and Lyme disease.

88.     Plaintiffs moved out of Unit B-207 on February 26, 2021.

89.     Plaintiffs incurred moving expenses of approximately $1,500.

90.     The acts and omissions of the Defendants described herein required additional treatment from medical health professionals for Plaintiffs existing disabilities that Defendants' acts and omissions exacerbated.

91.      The acts and omissions of the Defendants described herein required additional treatment from medical health professionals for physical, mental and emotional injuries caused exclusively by Defendants' acts and omissions, as opposed to Plaintiffs' existing disabilities and handicaps that Defendants' acts and omissions exacerbated.

92.     Defendants' acts and omissions caused Plaintiffs to incur bills of not less than

**$ 6,500** from various medical health care professionals to treat the physical, mental and emotional injuries that defendants acts and omissions caused Plaintiffs.

93.      Plaintiffs still suffer from PTSD (Post-Traumatic Stress Disorder) because of Defendants' acts and omissions described herein and continue to receive treatment from medical health professionals for the physical, mental and emotional injuries that Defendants caused.

94.      Plaintiff Lamont Stevens consulted with a psychiatrist for about a month and is currently undergoing ketamine therapy for severe PTSD and depression.  She does not know how long she will be seeing a psychiatrist but expects to incur ongoing expenses for trauma and depression once the ketamine therapy is completed.

## FIRST CAUSE OF ACTION

## Constructive Eviction Against All Defendants

97.      All preceding paragraphs are incorporated herein by reference.

98.      Steinmiller, Wasatch Commons, AMC and/or Woolsey were the "Owner" in the Agreement.

99.      Steinmiller, AMC and Woolsey were all authorized by Wasatch Commons to speak and act for it relative to the Agreement, its enforcement and Plaintiffs' concerns about its enforcement.

100.     Steinmiller, AMC and Woolsey were all under the control of Wasatch Commons and/or the Agreement's "Owner" relative to the Agreement, its enforcement and Plaintiffs' concerns about its enforcement.

101.     The "Owner" in the Agreement authorized the conduct of Steinmiller, AMC and Woolsey relative to the Agreement, its enforcement and Plaintiffs' concerns about its enforcement.

Their conduct is imputable to the "Owner" and "Owner" bears responsibility therefore under the doctrines of *respondeat superior* and/or master-servant.

102.    The Sargents as Renters under their Residential Rental Agreement were under the control of the "Owner" in that same Agreement relative to the Agreement, its enforcement and Plaintiffs' concerns about its enforcement.

103.    The pattern of disturbing intermittent and sustained noise during Quiet Hours most every night and morning throughout Plaintiffs' tenancy was a disturbance of Plaintiffs' possession of Unit B-207 by Wasatch Commons, AMC, Steinmiller and Woolsey.

104.    The pattern of disturbing intermittent and sustained noise during Quiet Hours most every night and morning throughout Plaintiffs' tenancy rendered Unit B-207 unfit for occupancy for the purposes for which it was demised to Plaintiffs.

105.     The pattern of disturbing intermittent and sustained noisy and boisterous conduct during Quiet Hours most every night and morning throughout Plaintiffs' tenancy was so substantial in nature and injurious to Plaintiffs as to deprive them of the beneficial enjoyment of Unit B-207 in its entirety, particularly considering the nature and purpose for which Unit B-207 was to be used.

106.    Steinmiller and Woolsey interfered with Plaintiffs' right of possession and enjoyment of Unit B-207 as to render it uninhabitable.

107.    Steinmiller and Woolsey interfered with Plaintiffs' right of possession and enjoyment of Unit B-207 as to render it uninhabitable i) individually; and ii) as the members, principals, employees and/or agents under the control of Wasatch Commons and/or AMC.

108.    Wasatch Commons and/or AMC interfered with Plaintiffs' right of possession and enjoyment of Unit B-207 as to render it uninhabitable.

16

109.     Wasatch Commons and/or AMC through their members, principals, employees and/or agents Steinmiller and Woolsey interfered with Plaintiffs' right of possession and enjoyment of Unit B-207 as to render it uninhabitable.

110.     The interfering acts and omissions of Wasatch Commons, AMC, Steinmiller and Woolsey were meritless.

111.     The interfering acts and omissions of Wasatch Commons, AMC, Steinmiller (individually and/or as an agent of Wasatch Commons and/or AMC) and Woolsey (individually and/or as an agent of Wasatch Commons and/or AMC) were done with the intent to substantially deprive Plaintiffs of the enjoyment and occupation of Unit B-207.

112.     The interfering acts and omissions of Wasatch Commons, AMC, Steinmiller and Woolsey did substantially deprive Plaintiffs of the enjoyment and occupation of Unit B-207.

113.     The interfering acts and omissions of Wasatch Commons, AMC, Steinmiller and Woolsey made it reasonably necessary for Plaintiffs to vacate Unit B-207.

114.     The interfering acts and omissions of Wasatch Commons, AMC, Steinmiller and Woolsey made it imperative for Plaintiffs to vacate Unit B-207.

115.     Plaintiffs vacated the premises within a reasonable time after i) the interfering acts and omissions of Wasatch Commons, AMC, Steinmiller and Woolsey; ii) Plaintiffs' repeated notices, corroboration and reminders thereof to Wasatch Commons, AMC, Steinmiller and Woolsey; and iii) Wasatch Commons, AMC, Steinmiller and Woolsey failing to cease or ameliorate the interfering acts.

116.     The failure of Wasatch Commons, AMC, Steinmiller and Woolsey to cease or ameliorate the interfering acts, particularly after Plaintiffs' repeated notices, corroboration and reminders thereof, was a material and egregious breach of the Agreement.

117.    The interfering acts and omissions of Wasatch Commons, AMC, Steinmiller and Woolsey and their failure to cease or ameliorate the interfering acts, particularly after Plaintiffs' repeated notices, corroboration and reminders thereof, was a protracted refusal by the Owner to fulfill their duties under the Agreement.

118.    The interfering acts and omissions of Wasatch Commons, AMC, Steinmiller and Woolsey and their failure to cease or ameliorate the interfering acts, particularly after Plaintiffs' repeated notices, corroboration and reminders thereof, posed a threat to health and safety and the landlord hasn't swiftly resolved the issue.

119.    Plaintiffs timely paid all monthly sums due during their tenancy at Unit B-207.

120.    Defendants constructively evicted Plaintiffs from Unit B-207.

121.    Plaintiffs were damaged as a direct result of Defendants constructively evicting Plaintiffs from Unit B-207.

122.    Plaintiffs are entitled to recover their economic damages suffered as a result of Defendants' constructive eviction of Plaintiffs from Unit B-207 in an amount to be proven at trial, but in all events not less than $100,000.

**SECOND CAUSE OF ACTION**

**Quiet Enjoyment Against Steinmiller, Wasatch Commons, AMC and Woolsey**

123.    All preceding paragraphs are incorporated herein by reference.

124.    The covenant of quiet enjoyment is synonymous with the covenant of warranty, both of which protect the grantee of a property interest from actual or constructive eviction by someone with superior title.

125.    Steinmiller, Wasatch Commons and/or AMC had superior title to Plaintiffs.

126. Steinmiller, Wasatch Commons and/or AMC promised Plaintiffs through the Agreement and its Addenda promised that they would protect Plaintiffs from "noisy and boisterous conduct" during Quiet Hours.

127. Plaintiffs had a right to the quiet enjoyment of Unit B-207 without noisy and boisterous conduct and its related and foreseeable disturbance to Plaintiffs.

128. Defendants interfered with Plaintiffs' quiet enjoyment of Unit B-207 through the same acts and omissions constituting their constructive eviction of Plaintiffs therefrom.

129. Plaintiffs were deprived of the full use and enjoyment of Plaitniffs' Unit as a direct result of Wasatch Commons, AMC, Steinmiller and Woolsey

130. Plaintiffs were damaged as a direct result of Wasatch Commons, AMC, Steinmiller and Woolsey interfering with Plaintiffs' quiet enjoyment of Unit B-207.

131. Plaintiffs are entitled to recover their economic damages suffered as a result of Defendants' interference with Plaintiffs' quiet enjoyment of Unit B-207 in an amount to be proven at trial, but in all events not less than $100,000.

## THIRD CAUSE OF ACTION

### Nuisance Against All Defendants

132. All preceding paragraphs are incorporated herein by reference.

133. Under *Utah Code Ann. 78B-6-1101(1)*, "A nuisance is anything that is injurious to health, indecent, offensive to the senses, or an obstruction of the free use of property, so as to interfere with the comfortable enjoyment of life or property. A nuisance may be the subject of an action."

134. Under *Utah Code Ann. 78B-6-1101(2)(f)*, "A nuisance may include party houses that frequently create conditions defined in Subsection (1)."

19

135.    Wasatch Commons, AMC, Steinmiller and Woolsey had reason to believe that Jackson Sargent and Bree Sargent kept and maintained a perpetual nuisance in their Unit because Plaintiffs so informed them each several times.

136.    Wasatch Commons, AMC, Steinmiller and Woolsey had reason to believe that Jackson Sargent and Bree Sargent kept and maintained a perpetual nuisance in their Unit but took no action to abate the nuisance obtain an order for the Sargents' automatic eviction.

137.    Jackson Sargent created and allowed a protracted nuisance by creating and allowing innumerable nuisances during Quiet Hours most every night and morning during Plaintiffs' tenancy at their Unit, as described above.

138.    The protracted and innumerable nuisances that Jackson Sargent created and allowed injured Plaintiffs physically, mentally and emotionally, as chronicled above.  They were also offensive to Plaintiffs' senses and interfered with their comfortable enjoyment of life and property, also as chronicled above.

139.    Bree Sargent created a protracted nuisance by creating and allowing innumerable nuisances during Quiet Hours most every night and morning during Plaintiffs' tenancy at their Unit, as described above.

140.    The protracted and innumerable nuisances that Bree Sargent created and allowed injured Plaintiffs physically, mentally and emotionally, as chronicled above.  They were also offensive to Plaintiffs' senses and interfered with Plaintiffs' comfortable enjoyment of life and property, also as chronicled above.

141.    Wasatch Commons created and/or allowed a protracted nuisance by allowing innumerable nuisances during Quiet Hours most every night and morning during Plaintiffs' tenancy at their Unit, as described above.

142.   The protracted and innumerable nuisances that Wasatch Commons created and/or allowed injured Plaintiffs physically, mentally and emotionally, as chronicled above.  They were also offensive to Plaintiffs' senses and interfered with Plaintiffs' comfortable enjoyment of life and property, also as chronicled above.

143.   AMC created and/or allowed a protracted nuisance by allowing innumerable nuisances during Quiet Hours most every night and morning during Plaintiffs' tenancy at their Unit, as described above.

144.   The protracted and innumerable nuisances that AMC created and/or allowed injured Plaintiffs physically, mentally and emotionally, as chronicled above.  They were also offensive to Plaintiffs' senses and interfered with Plaintiffs' comfortable enjoyment of life and property, also as chronicled above.

145.   Steinmiller created and/or allowed a protracted nuisance by allowing innumerable nuisances during Quiet Hours most every night and morning during Plaintiffs' tenancy at their Unit, as described above.

146.   The protracted and innumerable nuisances that Steinmiller created and/or allowed injured Plaintiffs physically, mentally and emotionally, as chronicled above.  They were also offensive to Plaintiffs' senses and interfered with Plaintiffs' comfortable enjoyment of life and property, also as chronicled above.

147.   Woolsey created and/or allowed a protracted nuisance by allowing innumerable nuisances during Quiet Hours most every night and morning during Plaintiffs' tenancy at their Unit, as described above.

148.   The protracted and innumerable nuisances that Woolsey created and/or allowed injured Plaintiffs physically, mentally and emotionally, as chronicled above.  They were also

21

offensive to Plaintiffs' senses and interfered with Plaintiffs' comfortable enjoyment of life and property, also as chronicled above.

149.    Plaintiffs and their leasehold property were injuriously affected by the nuisances that each Defendant created and/or allowed.

150.    Plaintiffs' personal enjoyment of their leasehold property was lessened by the nuisances that each Defendant created and/or allowed.

151.    Plaintiffs were damaged as a direct result of Defendants' nuisance.

152.    Plaintiffs are entitled under *§ 78B-6-1114(1)* to recover their economic damages suffered as a result of Defendants' nuisance in an amount to be proven at trial, but in all events at least $100,000.  Plaintiffs are also entitled thereunder to recover "costs, including the costs of investigation and discovery, and reasonable attorney fees, which are not compensated for pursuant to some other provision of law."

### FOURTH CAUSE OF ACTION

### Breach of Contract Against Steinmiller, Wasatch Commons AMC and Woolsey

153.    All preceding paragraphs are incorporated herein by reference.

154.    The Agreement that memorialized the terms and conditions under which Plaintiffs rented Unit B-207 from Steinmiller, Wasatch Commons, AMC and/or Woolsey bound all the parties thereto.

155.    The Agreement was a valid and enforceable contract.

156.    The Agreement also memorialized the mutual payments, promises and other consideration that the parties thereto paid, provided and/or promised.

157.    Steinmiller, Wasatch Commons, AMC and Woolsey each had the legal capacity to make the Agreement and understand its terms.

22

158.     Steinmiller, Wasatch Commons, AMC and Woolsey each understood the Agreement and its terms.

159.     Steinmiller, Wasatch Commons, AMC and/or Woolsey prepared the Agreement (including all its Addenda) or retained a third party to prepare it.  Plaintiffs had no input whatsoever in the Agreement's preparation and signed it in the form it was presented.

160.     Plaintiffs fully understood the terms of their Agreement.

161.     Plaintiffs fully and timely performed all their obligations under the Agreement.

162.     The "Community Policies and Procedures Addendum to the Lease Agreement" and the "Animal (Pet) Agreement" and the policies set forth therein were material to the Agreement.

163.     The written policy in the "Community Policies and Procedures Addendum to the Lease Agreement" that loud, boisterous and disturbing noises would not be allowed during Quiet Hours was a material inducement to Plaintiffs making the Agreement and performing on it.

164.     The assurances from Steinmiller, Wasatch Commons and/or AMC in their written "Community Policies and Procedures Addendum to the Lease Agreement" that loud, boisterous and disturbing noises during Quiet Hours constituted a material breach by a Renter of the Residential Rental Agreement was also a material inducement to Plaintiffs making the Agreement and performing on it.

165.     The assurances from Steinmiller, Wasatch Commons and/or AMC in their written "Community Policies and Procedures Addendum to the Lease Agreement" that "noisy and boisterous conduct" during Quiet Hours was grounds for an offending Renter's immediate eviction was also a material inducement to Plaintiffs making the Agreement.

166.     The written policy in the "Animal (Pet) Agreement" stating, "Nor may the Animal cause any discomfort, annoyance, or nuisance to any other resident or to Owner" was also a material inducement to Plaintiffs making the Agreement and performing on it.

167.     The written policy in the "Animal (Pet) Agreement" stating "Residents agree to comply with all applicable governmental laws and regulations" was also a material inducement to Plaintiffs making the Agreement and performing on it.

168.     The written policy in the "Animal (Pet) Agreement" giving the "Owner" in the Agreement (Steinmiller, Wasatch Commons and/or AMC) the discretion to have an offending Renter "immediately and permanently remove the[ir] Animal from the premises" was also a material inducement to Plaintiffs making the Agreement and performing on it.

169.     Plaintiffs expected that all residents of Wasatch Commons would comply with its written policies, rules and regulations as much as Wasatch Commons expected Plaintiffs to comply with them.

170.     Plaintiffs expected that Wasatch Commons would enforce its written policies, rules and regulations with which it ostensibly required all Residents of Wasatch Commons to conform as those policies, rules and regulations provided.

171.     Plaintiffs' reliance on the written policies, rules and regulations and their prompt enforcement against offending Renters.

172.     The Agreement, including its Addenda and including without limitation thereunder its "Community Policies and Procedures Addendum to the Lease Agreement" and its "Animal (Pet) Agreement," were critical to fulfilling the essential purposes of the Agreement, Defendants' performance thereunder and Plaintiff's reasonable expectations therein.

173.    Plaintiffs' reliance on the written polices, rules and regulations that were material inducements to them making and performing on the Agreement was reasonable in light of the Agreement's plain language and all other circumstances.

174.    Steinmiller, Wasatch Commons, AMC and/or Woolsey violated the Agreement, its "Community Policies and Procedures Addendum to the Lease Agreement" and its "Animal (Pet) Agreement" by not enforcing them as represented and as set forth above.

175.    The breaches of the Agreement, its "Community Policies and Procedures Addendum to the Lease Agreement" and its "Animal (Pet) Agreement" by Steinmiller, Wasatch Commons, AMC and/or Woolsey were material breaches of the Agreement.

176.    Plaintiffs were damaged as a direct result of the breaches of the Agreement, its "Community Policies and Procedures Addendum to the Lease Agreement" and its "Animal (Pet) Agreement" by Steinmiller, Wasatch Commons, AMC and/or Woolsey.

177.    Plaintiffs are entitled to recover from Steinmiller, Wasatch Commons, AMC and/or Woolsey, jointly and severally, their damages suffered from their material breaches of the Agreement, its "Community Policies and Procedures Addendum to the Lease Agreement" and its "Animal (Pet) Agreement," including their economic (including expectation) and consequential damages for losses known and/or foreseeable to all parties when the Agreement was made in an amount to be proven at trial, but in all events at least $100,000.

### FIFTH CAUSE OF ACTION

### Violations of the Utah Fair Housing Act Against All Defendants

178.    All preceding paragraphs are incorporated herein by reference.

179.    Under *§ 52-21-2* of the Utah Act a "Discriminatory Housing Practice" "means an act that is unlawful under this chapter."

180.     Under *§ 52-21-5(1)(b)* of the Utah Act it is a Discriminatory Housing Practice to "discriminate against a person in the terms, conditions, or privileges . . . in providing facilities or services in connection with the dwelling."

181.     Under *§ 52-21-5(4)(b)* of the Utah Act, "A Discriminatory Housing Practice includes a refusal to make a reasonable accommodation in a rule, policy, practice, or service when the accommodations may be necessary to afford the person equal opportunity to use and enjoy a dwelling."

182.     Under *§ 52-21-6* of the Utah Act, "It is a Discriminatory Housing Practice for a person whose business includes engaging in residential real estate-related transactions to discriminate against any person . . . in the terms or conditions of the residential real estate-related transaction, because of . . . disability."

183.     Under *§ 52-21-7(1)(a)* of the Utah Act, "It is a Discriminatory Housing Practice to . . . intimidate . . . or interfere with a person in the exercise [and] enjoyment of a right granted or protected under this chapter because that person exercised a right protected under this chapter

184.     Under *§ 52-21-7(1)(b)* of the Utah Act, "It is a Discriminatory Housing Practice to . . . aid, abet, incite, compel, or coerce a person to engage in a practice prohibited by this chapter."

185.     Under *§ 52-21-7(1)(f)* of the Utah Act, "It is a Discriminatory Housing Practice to . . . engage in a reprisal against a person because that person opposed a practice prohibited under this chapter."

186.     Wasatch Commons through its authorized agents AMC, Steinmiller and Woolsey engaged in acts that are unlawful under the Federal Act and the Utah Act and accordingly engaged also in Discriminatory Housing Practices under *42 U.S.C. § 3602(f)* of the Federal Act.

187.     Specifically, Wasatch Commons engaged in Discriminatory Housing Practices by, without limitation: i) failing to enforce its own Agreement, "Community Policies and Procedures Addendum to the Lease Agreement" and "Animal (Pet) Agreement" against the Sargents; ii) to Plaintiffs' physical, mental, emotional and financial detriment, as described above; iii) even though Wasatch Commons knew of the Sargents' repeated violations of the Agreement, "Community Policies and Procedures Addendum to the Lease Agreement" and "Animal (Pet) Agreement,"  Plaintiffs' disabilities and the effect that the Sargents' pattern of noisy and boisterous conduct was having on them; iv) because the Sargents' schedules were different from Plaintiffs' schedules; v) because the frequency and intensity of the noisy and boisterous behavior in which the Sargents and their two dogs engaged and that Wasatch Commons never "verified" was still somehow substantially the same as that in which the Sargents and their infant children would have engaged had the Sargents (who are biological siblings) had infant children in Unit B-307; vi) and because of Plaintiffs' disabilities and handicaps; vii) *then* intimidated and interfered with Plaintiffs' in the exercise and enjoyment of their rights under the Utah Act; viii) because Plaintiffs exercised their rights thereunder; ix) *then* aided, abetted, incited, compelled and/or coerced the other Defendants hereto to also violate the Utah Act; x) and engaged in reprisals against Plaintiffs because they opposed Defendants' Discriminatory Housing Practices; xi) all because of Plaintiffs' documented disabilities and handicaps.

188.     AMC through its authorized agents Steinmiller and Woolsey engaged in "Discriminatory Housing Practices" under the Utah Act in the same ways as Wasatch Commons.

189.     Steinmiller engaged in Discriminatory Housing Practices under the Utah Act as the authorized agent of Wasatch Commons and/or AMC as described above.

190. Woolsey engaged in Discriminatory Housing Practices under the Utah Act as the authorized agent of Wasatch Commons and/or AMC as described above.

191. Jackson Sargent and Bree Sargent engaged in Discriminatory Housing Practices under the Utah Act.

192. Specifically, Jackson Sargent and Bree Sargent engaged in Discriminatory Housing Practices by, without limitation: i) breaching their own Residential Rental Agreement and the "Community Policies and Procedures Addendum to the Lease Agreement" and "Animal (Pet) Agreement" therein; ii) to Plaintiffs' physical, mental, emotional and financial detriment, as described above; iii) even though the Sargents knew of their repeated violations of the Agreement, "Community Policies and Procedures Addendum to the Lease Agreement" and "Animal (Pet) Agreement,"  Plaintiffs' disabilities and the effect that their pattern of noisy and boisterous conduct was having on them; iv) *then* deliberately and vindictively accelerated the frequency and volume of their noisy and boisterous conduct to deliberately further injure Plaintiffs; v) otherwise intimidated and interfered with Plaintiffs' in the exercise and enjoyment of their rights under the Utah Act; viii) because Plaintiffs exercised their rights thereunder; vi) *then* aided, abetted, incited, compelled and/or coerced each other and the other Defendants hereto to also violate the Utah Act; vii) and engaged in other reprisals against Plaintiffs because they opposed Defendants' Discriminatory Housing Practices; viii) all because of Plaintiffs' documented disabilities and handicaps.

193. Plaintiff Lamont claims herein to have been injured by a Discriminatory Housing Practice and is therefore an "Aggrieved Person" under *42 U.S.C. § 3602(i)(1)* of the Federal Fair Housing Act (below) and *§ 57-21-2(2)(a)* of the Utah Act.

194.    Plaintiff Lamont Stevens claims herein to have been injured by a Discriminatory Housing Practice and is therefore also an "Aggrieved Person" under *42 U.S.C. § 3602(i)(1)* of the Federal Fair Housing Act and *§ 57-21-2(2)(a)* of the Utah Act.

195.    Jackson Sargent and Bree Sargent engaged in their first Discriminatory Housing Practice on or about July 1, 2020 and their last Discriminatory Housing Practice on or about February 26, 2021, when Plaintiffs moved out of Unit B-207.

196.    Wasatch Commons, AMC, Steinmiller, Woolsey and the Doe Defendants who are the authorized agents of one or more of them engaged in their first Discriminatory Housing Practice on or about September 21, 2021, when Plaintiffs provided them their first documentation of the Sargents' noisy and boisterous conduct during Quiet Hours most every night and morning. Wasatch Commons, AMC, Steinmiller, Woolsey and the Doe Defendants who are the authorized agents of one or more of them engaged in their last Discriminatory Housing Practice on or about February 26, 2021, when Plaintiffs moved out Unit B-207.

197.    Plaintiffs were damaged as a direct result of Defendants' Discriminatory Housing Practices and breaches of the Utah Act set forth herein.

198.    Plaintiffs are entitled under *§§ 52-21-11(1)(b)* and *52-21-12(7)* of the Utah Act to a judgment against each Defendant, jointly and severally, for actual economic damages of not less than $100,000, a reasonable attorney's fee and costs, other consequential damages and punitive damages sustained from Defendants' Discriminatory Housing Practices and breaches of the Utah Act in an amount to be proven at trial, but in all events not less than $2 million.

199.    Plaintiffs are also entitled under *§ 52-21-11(2)(a)* to $10,000 from each Defendant if this their (respective) first instance of a Discriminatory Housing Practice and violation of the Utah Act, $20,000 from each Defendant if this is their second (respective) instance of a

Discriminatory Housing Practice in the five-year period immediately preceding this Verified

Complaint's filing, and $50,000 if this is their third (respective) Discriminatory Housing Practice

in the seven-year period immediately preceding this Verified Complaint's filing.

200.     Plaintiffs are entitled to the statutory damages under *§ 52-21-11(2)(a)* of the Utah

Act for their Discriminatory Housing Practices against Plaintiffs from each Defendant,

respectively, in an amount to be proven at trial, but in all events $10,000, $25,000 or $50,000 from

each Defendant.

201.     Defendants' Discriminatory Housing Practices and other violations of the Federal

Act shock the conscience and manifested Defendants' disregard and knowing and reckless

indifference toward Plaintiffs' rights.

202.     Plaintiffs are entitled to punitive damages to punish Defendants for their

Discriminatory Housing Practices and other violations of the Federal Fair Housing Act.

## SIXTH CAUSE OF ACTION

### Violations of the Federal Fair Housing Act Against All Defendants

203.     All preceding paragraphs are incorporated herein by reference.

204.     Under the federal Fair Housing Act (the "Federal Act"), *42 U.S.C. § 3604(f)(2)(A)*

"it shall be unlawful . . . [t]o discriminate against any person in the terms, conditions, or privileges

of sale or rental of a dwelling, or in the provision of serv ices or facilities in connection with such

dwelling, because of a handicap of that person."

205.     Under *42 U.S.C. § 3604(f)(3)* of the Federal Act "discrimination includes . . . a

refusal to make reasonable accommodations in rules, policies, practices, or services, when such

accommodations may be necessary to afford such person equal opportunity to use and enjoy a

dwelling."

206.    Under *42 U.S.C. 3605(a)* of the Federal Act, "[I]t shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person . . . in the terms or conditions of such a transaction; because of . . . handicap."

207.    Under *42 U.S.C. 3617* of the Federal Act, "It shall be unlawful to . . . intimidate . . . or interfere with any person in the exercise or enjoyment of . . . any right granted or protected by section *3604* [or] *3605* . . . of this title."

208.    Wasatch Commons engaged in acts that are unlawful under the Federal Act and accordingly engaged also in Discriminatory Housing Practices under *42 U.S.C. § 3602(f)* of the Federal Act by, without limitation: i) failing to enforce its own Agreement, "Community Policies and Procedures Addendum to the Lease Agreement" and "Animal (Pet) Agreement" against the Sargents; ii) to Plaintiffs' physical, mental, emotional and financial detriment, as described above; iii) even though Wasatch Commons knew of the Sargents' repeated violations of the Agreement, "Community Policies and Procedures Addendum to the Lease Agreement" and "Animal (Pet) Agreement,"  Plaintiffs' disabilities and the effect that the Sargents' pattern of noisy and boisterous conduct was having on them; iv) because the Sargents' schedules were different from Plaintiffs' schedules; v) because the frequency and intensity of the noisy and boisterous behavior in which the Sargents and their two dogs engaged and that Wasatch Commons never "verified" was still somehow substantially the same as that in which the Sargents and their infant children would have engaged had the Sargents (who are biological siblings) had infant children in Unit B-307; vi) and because of Plaintiffs' disabilities and handicaps; vii) *then* intimidated and interfered with Plaintiffs' in the exercise and enjoyment of their rights under the Utah Act; viii) because Plaintiffs exercised their rights thereunder; ix) *then* aided, abetted, incited, compelled and/or

coerced the other Defendants hereto to also violate the Utah Act; x) and engaged in reprisals against Plaintiffs because they opposed Defendants' Discriminatory Housing Practices; xi) all because of Plaintiffs' documented disabilities and handicaps.

209.    AMC through its authorized agents Steinmiller and Woolsey also engaged in acts that are unlawful under the Federal Act and accordingly engaged also in Discriminatory Housing Practices under *42 U.S.C. § 3602(f)* in the same ways as Wasatch Commons.

210.    Steinmiller engaged in Discriminatory Housing Practices under the Federal Act as the authorized agent of Wasatch Commons and/or AMC as described above.

211.    Woolsey engaged in Discriminatory Housing Practices under the Federal Act as the authorized agent of Wasatch Commons and/or AMC as described above.

212.    Jackson Sargent and Bree Sargent engaged in acts that are unlawful under the Federal Act and accordingly engaged also in Discriminatory Housing Practices under *42 U.S.C. § 3602(f)* by, without limitation: i) breaching their own Residential Rental Agreement and its "Community Policies and Procedures Addendum to the Lease Agreement" and "Animal (Pet) Agreement"; ii) to Plaintiffs' physical, mental, emotional and financial detriment, as described above; iii) even though the Sargents knew of their repeated violations of the Agreement, "Community Policies and Procedures Addendum to the Lease Agreement" and "Animal (Pet) Agreement," Plaintiffs' disabilities and the effect that their prohibited noisy and boisterous conduct was having on them; iv) *then* deliberately accelerating the frequency and volume of their noisy and boisterous conduct to deliberately further injure Plaintiffs; v) otherwise intimidating and interfering with Plaintiffs' in the exercise and enjoyment of their rights under the Utah Act; viii) because Plaintiffs exercised their rights thereunder; vi) *then* aiding, abetting, inciting, compelling and/or coercing each other and the other Defendants hereto to also violate the Utah Act; vii) and

32

engaging in other reprisals against Plaintiffs because they opposed Defendants' Discriminatory

Housing Practices; viii) all because of Plaintiffs' documented disabilities and handicaps.

213.   Plaintiffs were damaged as a direct result of Defendants' Discriminatory Housing

Practices and breaches of the Federal Act set forth herein.

214.   Plaintiffs are entitled under *42 U.S.C. § 3613(c)* of the Federal Act to actual

damages, punitive damages, a reasonable attorney's fee and costs as damages sustained from

Defendants' Discriminatory Housing Practices and breaches of the Federal Act in an amount to be

proven at trial, but in all events not less than $2 million.

215.   Defendants' Discriminatory Housing Practices and other violations of the Federal

Act shock the conscience and manifested Defendants' disregard and knowing and reckless

indifference toward Plaintiffs' rights.

216.   Plaintiffs are entitled to punitive damages to punish Defendants for their

Discriminatory Housing Practices and other violations of the Utah Fair Housing Act.

## SEVENTH CAUSE OF ACTION

### Interference with Contract Against All Defendants

217.   All preceding paragraphs are incorporated herein by reference.

218.   All Defendants to this lawsuit knew that Plaintiffs occupied Unit B-207 between

July 2020 and February 2021.

219.   All Defendants to this lawsuit knew that Plaintiffs occupied Unit B-207 under a

"Residential Rental Agreement" identical or substantially identical to Plaintiffs' Agreement.

220.   Steinmiller, Wasatch Commons, AMC and/or Woolsey had actual notice of the

Agreement because one of them signed it, one or more acted as the agent of one or more of the

other as to Wasatch Commons' Agreement and its dealings with Plaintiffs.

221.    Jackson Sargent and Bree Sargent had constructive notice of Plaintiffs' Agreement because Jackson Sargent and Bree Sargent occupied the Sargent Unit pursuant to a "Residential Rental Agreement" identical or substantially identical to Plaintiffs' Agreement.

222.    All Defendants hereto had actual and/or constructive notice of the terms of Plaintiffs' Agreement, including its Addenda.

223.    All Defendants hereto knew that Plaintiffs had a right to the quiet enjoyment of Unit B-207 under their Agreement.

224.    All Defendants hereto intentionally and improperly induced each other to not to perform their obligations thereunder and interfered with each other's performance.

225.    All Defendants intentionally interfered with Plaintiffs' Agreement, their anticipated benefit therefrom and their reasonable expectations thereunder.

226.    All Defendants hereto intentionally interfered with Plaintiffs' Agreement through improper means that did not necessarily reflect Defendants' state of mind.  Examples include without limitation i) treating the Sargents' dogs from the "Community Policies and Procedures Addendum to the Lease Agreement" and "Animal (Pet) Agreement" as if they were infant human children with corresponding legal rights; ii) deciding that the level and consistency of the "boisterous and noisy conduct" in the Sargent Unit during Quiet Hours every night and morning would be the same if the Sargents had had two infant children instead of two dogs; iii) using these predicates to minimize the "boisterous and noisy conduct" and trivialize Plaintiffs' repeated complaints and corroboration thereof as only subjectively offensive to Plaintiffs; iv) to justify not enforcing or following the "Community Policies and Procedures Addendum to the Lease Agreement" and its "Animal (Pet) Agreement."

227.    All Defendants hereto also intentionally interfered with Plaintiffs' Agreement through improper purposes, including without limitation i) the acts and omissions set forth in the immediately preceding paragraph; ii) breaching their own obligations under the Agreement; iii) their other violations of the common law and Federal Fair Housing Act, the Utah Fair Housing Act and the Utah Fit Premises Act (below); iv) concealing those breaches; v) interfering with Plaintiffs' quiet enjoyment of Unit B-207; and vi) injuring Plaintiffs in the sense of spite and a desire to harm Plaintiffs in retaliation for their efforts to enforce their legal rights.

228.    Plaintiffs were damaged as a direct result of Defendants' wrongful intentional interference with their Agreement by improper means.

229.    Plaintiffs are entitled to recover their economic and non-economic or "consequential" damages (including attorney fees and costs) suffered from Defendants' intentional interference with their Agreement to be proven at trial, but in all events not less than $100,000.

230.    Defendants' intentional interference with Plaintiffs' Agreement shocks the conscience and manifested Defendants' disregard and knowing and reckless indifference toward Plaintiffs' rights.

231.    Plaintiffs are also entitled to punitive damages under Utah law to punish Defendants' intentional interference with their Agreement.

### EIGHTH CAUSE OF ACTION

**Breach of Covenant of Good Faith and Fair Dealing Against Steinmiller, Wasatch Commons and AMC**

232.    All preceding paragraphs are incorporated herein by reference.

233.    The implied covenant of good faith and fair dealing applied to the Agreement.

234.    Steinmiller, Wasatch Commons and AMC through their material breaches of the Agreement described above injured Plaintiffs' right to receive the benefits expected from that same Agreement.

235.    The material breaches of the Agreement by Steinmiller, Wasatch Commons and AMC were inconsistent with the parties' agreed common purposes in making it and Plaintiffs' reasonable and justified expectations therein.

236.    Steinmiller, Wasatch Commons and AMC breached the covenant of good faith and fair dealing implied to their Agreement with Plaintiffs.

237.    The breaches of the implied covenant of good faith and fair dealing by Steinmiller, Wasatch Commons and AMC are additional material breaches of the underlying Agreement.

238.    Plaintiffs were damaged as a direct result of Defendants' breaches of the covenant of good faith and fair dealing with Plaintiff.

239.    Plaintiffs are entitled to recover from Steinmiller, Wasatch Commons, AMC and/or Woolsey, jointly and severally, their damages suffered from their breaches of the covenant of good faith and fair dealing implied to the Agreement, its "Community Policies and Procedures Addendum to the Lease Agreement" and its "Animal (Pet) Agreement," including their economic (including expectation) and consequential damages for losses known and/or foreseeable to all parties the Agreement when it was made in an amount to be proven at trial, but in all events at least $100,000.

240.    Defendants' acts and omissions constituting breach of the implied covenants of good faith and fair dealing shock the conscience and manifested Defendants' disregard and knowing and reckless indifference toward Plaintiffs' rights.

241.    Plaintiffs are also entitled to punitive damages under Utah law to punish Defendants' breaches of the implied covenants of good faith and fair dealing.

### NINTH CAUSE OF ACTION

**Violations of Utah Fit Premises Chapter Against Jackson Sargent and Bree Sargent**

242.    All preceding paragraphs are incorporated herein by reference.

243.    Plaintiffs' Agreement with Steinmiller, Wasatch Commons and/or AMC was a written agreement that established the terms, conditions, rules and other provisions regarding the use and occupancy of Unit B-207.

244.     Plaintiffs' Agreement with Steinmiller, Wasatch Commons and/or AMC was a "Rental Agreement" for a "Residential Rental Unit" under *Utah Code Ann. § 57-22-2(2)* and *(5)*.

245.    Plaintiffs were entitled under a rental agreement to occupy Unit B-207 to the exclusion of others.

246.    Jackson Sargent and Bree Sargent were entitled under a rental agreement to occupy the Sargent Unit to the exclusion of others.

247.    Plaintiffs, Jackson Sargent and Bree Sargent were each "Renters" of a "Residential Rental Unit" under a "Rental Agreement" *Utah Code Ann. § 57-22-2(2)*, *(4)* and *(5)*.

248.    Jackson Sargent and Bree Sargent were each "Owners" of the Sargent Unit under *§ 57-22-2(1)* of the Utah Fit Premises chapter as the lessors of the Sargent Unit.

249.    Plaintiffs, Jackson Sargent and Bree Sargent rented their Sargent Unit under a written "Útah Residential Rental Agreement" identical or substantially similar to Plaintiffs' Agreement, including its fully executed Addenda.

250.    Plaintiffs Jackson Sargent and Bree Sargent as "Renters" of a "Residential dwelling unit" under the Utah Fit Premises chapter were each required to "cooperate in maintaining [their] Residential Rental Unit in accordance with [the Utah Fit Premises] chapter."

251.    Plaintiffs Jackson Sargent and Bree Sargent as "Renters" of a "Residential dwelling unit" under the Utah Fit Premises chapter were each required to "comply with each rule, regulation, or requirement of the rental agreement."

252.    Plaintiffs Jackson Sargent and Bree Sargent as "Renters" of a "Residential dwelling unit" under the Utah Fit Premises chapter were each prohibited from interfering with Plaintiffs' peaceful enjoyment of Unit B-207.

253.    Jackson Sargent and Bree Sargent failed to comply with the rules, regulations and requirements of their own written Residential Rental Agreement, including without limitation its Addenda "Community Policies and Procedures Addendum to the Lease Agreement" and "Animal (Pet) Agreement."

254.    Jackson Sargent and Bree Sargent jointly and severally interfered with Plaintiffs' peaceful enjoyment of Unit B-207.

255.    Plaintiffs were damaged as a direct result of the Sargents' interference with Plaintiffs' peaceful enjoyment of Unit B-207.

256.    Plaintiffs are entitled under *§ 78B-6-1114(1)* to recover their economic damages suffered as a result of Defendants' nuisance in an amount to be proven at trial, but in all events not less than $100,000.  Plaintiffs are also entitled to recover under *§ 78B-6-1114(6)(7)* their costs and reasonable attorney fees.

## TENTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress Against All Defendants

257.    All preceding paragraphs are incorporated herein by reference.

258.    Defendants' respective and collective conduct toward Plaintiffs offended generally accepted standards of decency and morality and exceeded all bounds of what is usually tolerated in a civilized community.

259.    Defendants' respective and collective conduct toward Plaintiffs was outrageous and intolerable.

260.    Defendants intended to cause emotional distress or acted with reckless disregard of the probability of causing emotional distress to Plaintiffs.

261.    Plaintiffs suffered severe and extreme emotional distress as a direct result of Defendants' outrageous and intolerable conduct, including without limitation severe and extreme mental suffering and distress, nervous distress, trauma, stress and post-traumatic stress.

262.    Defendants acted with the intent of inflicting emotional distress on Plaintiffs.

263.    Defendants in the alternative intentionally performed acts so unreasonable and outrageous that they knew or should have known it was highly probable that harm to Plaintiffs would result.

264.    Plaintiffs did suffer direct physical, mental and emotional harm as a direct result of Defendants' intentional outrageous and intolerable conduct.

265.    Defendants intentionally inflicted emotional distress on Plaintiffs.

266.    Plaintiffs are entitled to economic and non-economic "consequential" damages (including attorney fees and costs) against Defendants in an amount to be proven at trial for their intentional infliction of emotional distress on Plaintiffs, but in all events not less than $2 million.

267.    Defendants' intentional infliction of emotional distress on Plaintiffs shock the conscience and manifested their disregard and knowing and reckless indifference toward Plaintiffs' rights.

268.    Plaintiffs are also entitled to punitive damages under Utah law to punish Defendants' intentional infliction of emotional distress.

## ELEVENTH CAUSE OF ACTION

### Negligent Infliction of Emotional Distress Against All Defendants

269.    All preceding paragraphs are incorporated herein by reference.

270.    This cause of action is pleaded in the alternative under *Federal Rule of Civil Procedure 8(d)(2)* in the event the jury finds that Defendants did not intentionally inflict emotional distress on Plaintiffs.

271.    Defendants owed Plaintiffs a duty of reasonable care to avoid injuring Plaintiffs.

272.    Reasonable persons in Defendants' situation relative to Plaintiffs would have removed the Sargents' dogs from the Sargent Unit, evicted them for breaching the Agreement and/or otherwise enforced it.

273.    Defendants' acts and omissions described above were not the acts and omissions of a reasonably careful person in a similar situation.

274.    Defendants' acts and omissions described above were not the acts and omissions of a reasonably careful person in who was also aware of Plaintiffs' disabilities, as Defendants were.

275.    Defendants engaged in conduct that they should have realized involved an unreasonable risk of causing emotional distress to Plaintiffs.

276.    Defendants should have realized that their conduct could cause the sort of emotional distress that might result in illness or bodily harm.

277.    Defendants' conduct unintentionally caused illness and actual physical harm to Plaintiffs.

278.    Plaintiffs and Unit B-207 were in such close proximity to the threats of harm created by Defendants' negligent conduct that they were placed in actual physical peril.

279.    Plaintiffs actually witnessed each other sustain illness and other actual physical harm and were within its zone of danger.

280.    Plaintiffs did suffer direct physical, mental and emotional harm as a direct result of Defendants' conduct.

281.    Defendants negligently inflicted emotional distress on Plaintiffs.

282.    Plaintiffs are entitled to economic and non-economic "consequential" damages (including attorney fees and costs) against Defendants in an amount to be proven at trial for their negligent infliction of emotional distress on Plaintiffs, but in all events not less than $1 million.

## TIER III DISCOVERY DESIGNATION AND JURY DEMAND

This is a Tier III case for discovery and scheduling purposes under *Federal Rule of Civil Procedure 26*.  Plaintiffs demand trial by jury of their claims that require findings of fact and have paid the required jury fee herewith.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

On their First Cause of Action for Constructive Eviction, their Second Cause of Action for Breach of Quiet Enjoyment and their Fourth Cause of Action for Breach of Contract:

1.    A judgment affirming the joint and several liability of the Defendants to those respective Causes of Action to Plaintiffs on those Causes of Action;

2.    A judgment against Steinmiller, Wasatch Commons, AMC and/or Woolsey,

41

jointly and severally, to compensate Plaintiffs for their economic (including expectation) and consequential damages (including attorney fees and costs) for losses known and/or foreseeable to all parties to the Agreement when it was made in an amount to be proven at trial, but in all events at least $100,000; and

3. Attorney fees and costs not awarded as consequential damages; and

4. Any other relief that this court and/or the jury award Plaintiffs.

On their Third Cause of Action for Nuisance:

1. A judgment affirming each Defendants' joint and several liability to Plaintiffs for Nuisance;

2. Economic or "actual" damages of $100,000;

3. "Costs, including the costs of investigation and discovery, and reasonable attorney fees, which are not compensated for pursuant to some other provision of law" per *Utah Code Ann. § 78B-6-1114(1)*; and

4. Any other relief that this court and/or the jury award Plaintiffs.

On their Fifth Cause of Action for breach of the Utah Fair Housing Act:

1. A judgment affirming Defendants' Discriminatory Housing Practices and other violations of the Utah Fair Housing Act and liability to Plaintiffs therefore;

2. A judgment against each Defendant, jointly and severally, under *§§ 52-21-11(1)(b) and 52-21-12(7)* of the Utah Act for actual economic damages of not less than $100,000, a reasonable attorney's fee and costs, other consequential damages and punitive damages sustained from Defendants' Discriminatory Housing Practices and breaches of the Utah Act in an amount to be proven at trial, but in all events not less than $2 million;

3.      A judgment against each Defendant, jointly and severally, under *§ 52-21-11(2)(a)* of the Utah Act for $10,000 from each Defendant if this their (respective) first instance of a Discriminatory Housing Practice and violation of the Utah Act, $20,000 from each Defendant if this is their second (respective) instance of a Discriminatory Housing Practice in the five-year period immediately preceding this Verified Complaint's filing, and $50,000 if this is their third (respective) Discriminatory Housing Practice in the seven-year period immediately preceding this Verified Complaint's filing;

4.      A judgment for statutory damages under *§ 52-21-11(2)(a)* of the Utah Act for their Discriminatory Housing Practices against Plaintiffs from each Defendant, respectively, in an amount to be proven at trial, but in all events $10,000, $25,000 or $50,000 from each Defendant; and

5.      Any other relief that this court and/or the jury award Plaintiffs.

On their Sixth Cause of Action for breach of the Federal Fair Housing Act:

1.      A judgment affirming Defendants' Discriminatory Housing Practices and other violations of the Federal Fair Housing Act and joint and several liability to Plaintiffs therefore;

2.      Economic or "actual" damages, punitive damages and a reasonable attorney's fee and costs per *42 U.S.C. § 3613(c)* as damages sustained from Defendants' Discriminatory Housing Practices and breaches of the Federal Act of $2 million;

3.      Punitive damages as awarded by this court and/or the jury and allowed by law; and

4.      Any other relief that this court and/or the jury award Plaintiffs.

43

On their Seventh Cause of Action for Intentional Interference with Contractual Relations and their Tenth Cause of Action for Intentional Infliction of Emotional Distress:

1.   A judgment affirming the joint and several liability of the Defendants to those respective Causes of Action to Plaintiffs under those respective Causes of Action;

2.   Economic and non-economic "consequential" damages (exclusive of attorney fees and costs) of $2 million;

3.   Punitive damages as awarded by this court and/or the jury and allowed by law; and

4.   Any other relief that this court and/or the jury award Plaintiffs.

On their Eighth Cause of Action for Breach of the Implied Covenant of Good Faith and Fair Dealing:

1.   A judgment that Steinmiller, Wasatch Commons, AMC and/or Woolsey are liable, jointly and severally, for breaching the covenant of good faith and fair dealing implied to the Agreement, its "Community Policies and Procedures Addendum to the Lease Agreement" and its "Animal (Pet) Agreement";

2.   A judgment against Steinmiller, Wasatch Commons, AMC and/or Woolsey, jointly and severally, to compensate Plaintiffs for their economic (including expectation) and consequential damages (including attorney fees and costs) for losses known and/or foreseeable to all parties to the Agreement when it was made in an amount to be proven at trial, but in all events at least $100,000;

3.   Attorney fees and costs not awarded as consequential damages; and

4.   Any other relief that this court and/or the jury award Plaintiffs.

On their Eleventh Cause of Action for Negligent Infliction of Emotional Distress:

1.      A judgment affirming that Defendant negligently inflicted emotional distress on

Plaintiffs and their joint and several liability to Plaintiffs therefore;

2.      Economic and non-economic "consequential" damages (exclusive of attorney fees

and costs) of $1 million;

3.      Punitive damages as awarded by this court and/or the jury and allowed by law; and

4.      Any other relief that this court and/or the jury award Plaintiffs.

DATED _____ June __, 2021.

**OTTO LAW, LLC**

_/s/ Mike Otto_____
Attorney for Plaintiffs

_/s/ Cheryl Lamont Stevens_____
Cheryl Lamont Stevens, Plaintiff *

* Mrs. Stevens' electronic signature made
with her authorization and permission

_/s/ Douglas Lamont_____
Douglas Lamont, Plaintiff *

* Mr. Lamont's electronic signature made
with his authorization and permission